# EXHIBIT A

# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement ("**Agreement**") is made as of April 1, 2021 ("**Effective Date**"), by and between Regal Games, LLC ("**Seller**") and SellerX Eight GmbH ("**Buyer**"), collectively referred to as the ("**Parties**").

RECITALS:

WHEREAS, Chalk City consisting of select sidewalk chalk products (the "**Business**") is a portion of Seller's portfolio;

WHEREAS, Seller desires to sell of all Seller's Assets related to the Business and Buyer desires to purchase said Assets upon the terms and conditions of this Agreement; and

WHEREAS, the Parties will enter into an escrow agreement with the Ecommerce Law Group (the "**Escrow Agent**") ("**Escrow Agreement**") and a consulting agreement (the "**Consulting Agreement**") with Knoza Consulting LLC (the "**Migration Consultant**"):

NOW, THEREFORE, the Parties agree as follows:

(1) **Purchase of Assets**. In consideration of the Purchase Price, Seller hereby sells, assigns, transfers, conveys and delivers to Buyer, and Buyer hereby purchases from Seller right, title and interest in each of the following (collectively referred to as the "**Assets**"):

 (a) The www.chalkcity.com domain name and its associated domain name registration;

 (b) Amazon product listings (ASINs), the details of which are provided in **Schedule 1**;

 (c) All accounts, content, data, customer lists, databases, files, and artwork exclusively associated with the Business;

 (d) All trademark and trade names and related goodwill associated with the Business and all copyright and patent rights associated with the Business including (but not limited to) those listed in **Schedule 2**;

 (e) All licenses for applications or plugins used in connection with the Business;

 (f) All goodwill created by Seller associated with the Business, all value of the Business as a going concern, and all records exclusively related to the Business including, without limitation, customer records, customer information, customer cards, advertising matter, correspondence, mailing lists, credit records, purchasing materials and records,

DocuSign Envelope ID: 8479C290-074F-411D-AEC6-C878629DA34E

Case 1:22-cv-07455-ER   Document 1-2   Filed 08/31/22   Page 3 of 16

        blueprints, data bases, supplier information and records, and all other data and know-how related to the Business, in any form or medium wherever located;

(g)     All prepaid expenses and subscriptions as of the Effective Date of this Agreement associated with the Business; and,

(h)     All inventory housed at Amazon Fulfillment Centers, any third party logistics centers or in transit on the Effective Date (collectively, the "**Chalk**") and any open deposits for product on the Effective Date at the then current exchange rate (together with the Chalk, "**Inventory**"). For the avoidance of doubt, the Chalk shall be valued at cost i.e. the actual cost of Chalk as purchased from the manufacturer, plus shipping costs (including shipping costs related to shipment to a "fulfillment by Amazon" (FBA) warehouse facility), plus duty and tariff expenses, to the extent such costs were actually incurred by the Seller.

(2)     **Exemptions from Assets**. The following are specifically exempted from the sale: Seller's cash within its accounts, bank investment accounts or other cash equivalents held by or in the name of the Seller (inkling any cash or disbursement amounts to be credited to the Seller's bank account), any physical assets of general nature, such as computers, office equipment, mobile devices, real estate and vehicles (the "**Excluded Assets**").

(3)     **No Assumption of Liabilities**. Notwithstanding any other provision of this Agreement, Buyer will not assume and shall not be responsible for the payment, performance or discharge of any liabilities or obligations of Seller, occurred before the Effective Date. Without limiting the foregoing, Seller, and not Buyer, shall be responsible for any and all liabilities, responsibilities, expenses and obligations relating to (a) the Business (or any part thereof) incurred, accruing or arising before the Effective Date, even if not asserted or discovered until on or after the Effective Date, (b) the Excluded Assets.

(4)     **Purchase Price**. Buyer agrees to pay and Seller agrees to accept the following payments (collectively, "**Purchase Price**") for the sale of the Assets.

    (a)     **Upfront Payment**: Buyer shall pay to Seller an upfront payment equal to $3,950,000 ("**Upfront Payment**"). The parties agree that Buyer will pay the Escrow Agent the Upfront Payment on the Effective Date.

    (b)     **Deferred Payment:** Deferred consideration equal to US$900,000 ("**Deferred Payment**"), which shall be paid no later than May 31, 2022 with exact amounts adjusted as follows:

SellerX - Asset Purchase Agreement
Page 2 of 15

- The entire Deferred Payment if Net Sales for all chalk products and the Road Maker in the period between May 1, 2021 and April 30, 2022 ("**Trailing Period**") increase, remain flat, or decrease by less than 5% compared to the Net Sales in the period of 12 months prior to the Trailing Period ("**Reference Period**");
- $90,000 less for every full percentage point of decrease of Net Sales between 5% to 15% compared to the Net Sales in the Reference Period until the amount decreases to $0;
- $0 if Net Sales in the Trailing Period decrease by 15% or more compared to the Net Sales in the Reference Period.

"**Net Sales**" is defined as revenue (net of all discounts, returns and applicable sales and/or value-added taxes) accumulated from sellercentral and all non-Amazon sales.

(c) Earn Out Payment: Earn-out consideration ("**Earn-Out Payment**") determined based on a profit-sharing arrangement between the Buyer and the Seller on EBITDA generated by the Assets (the "**EBITDA**") in the period of 12 months following the Effective Date (the "**Earn-Out Period**"). For the avoidance of doubt, the EBITDA shall be defined as earnings before interest, taxes, depreciation, and amortization associated with operating the Business, provided that the following general overhead expenses should be disregarded for the purpose of the earnings calculation: costs of accounting and legal advice, human resources, rent, maintenance, utilities and administration. The Earn-Out Payment will be paid within 8 weeks after the expiry of the Earn-Out Period. The Buyer will pay 40% of the EBITDA over US$ 1,112,676 earned in the Earn-Out Period.

(d) **Inventory Payment**: Buyer shall pay to Seller US$361,626 for Seller's inventory ("**Inventory Payment**") on the Effective Date. The Inventory Payment is subject to the reconciliation provisions of this Agreement below.

(5) **Deferred Payment Statement, Earn-Out Statement**. Within fourteen (14) days following the completion of the Trailing Period, Buyer shall provide Seller with a statement (the "**Deferred and Earn-Out Payment Statement**") that sets forth the Net Sales and EBITDA for the Trailing Period together with reasonable documentation supporting the information set forth in the Deferred and Earn-Out Payment Statement . After delivery of the Deferred and Earn-Out Payment Statement, Seller and its accountants shall be permitted to make inquiries of Buyer and its accountants regarding questions concerning, or disagreements with respect to, the Deferred and Earn-Out Payment Statement. If Seller has any objections to the Deferred and Earn-Out Payment Statement, then Seller shall deliver to Buyer a statement (a "**Payment Objection**

**Statement**") setting forth its disputes or objections (the "**Payment Disputes**") to the Deferred and Earn-Out Payment Statement and, to the extent practical, Seller's proposed resolution of each such Payment Dispute. If a Payment Objection Statement is not delivered to Buyer within fourteen (14) days after delivery of the Deferred and Earn-Out Payment Statement, then the Deferred and Earn-Out Payment Statement as originally delivered by Buyer shall be final, binding and non-appealable by the parties. If a Payment Objection Statement is timely delivered, then Buyer and Seller shall negotiate in good faith to resolve any Payment Disputes, but if they do not reach a final resolution within thirty (30) days after the delivery of the Payment Objection Statement, Seller and Buyer shall engage and submit each unresolved Payment Dispute to a mutually agreed upon certified public accountant (the "**Independent Auditor**") to resolve such Payment Disputes. The Independent Auditor shall be instructed to set forth a procedure to provide for prompt resolution of any unresolved Payment Disputes and, in any event, to make its determination in respect of such Payment Disputes within thirty (30) days following its retention. The Independent Auditor shall only consider those items in the Payment Objection Statement that remain in dispute at the time of its engagement, shall resolve each such item within the range difference between Buyer and Seller, and shall make its determination based solely on the presentations by Buyer and Seller and not by independent review. The Independent Auditor's determination of such Payment Disputes shall be final and binding and non-appealable upon the parties. The fees and expenses of the Independent Auditor shall be paid by Seller, on the one hand, and by Buyer, on the other hand, based upon the percentage that the amount actually contested but not awarded to Seller or Buyer, respectively, bears to the aggregate amount actually contested by Seller and Buyer.

(6) **Payment of Purchase Price**. On the Effective Date, if not already completed, Buyer shall deposit the Upfront Payment with the Escrow Agent. The Escrow Agent shall distribute the Upfront Payment consistent with the terms of the Escrow Agreement.

(7) **Migration Process**.

    (a) Subsequent to the Effective Date of this Agreement, the process to transfer the Assets to the Buyer will begin ("**Migration Process**"). The Parties understand and agree that the Migration Process typically takes 2 to 8 weeks to complete, but could take substantially longer- The parties agree to work together in good faith and provide their best efforts to complete the Migration Process as promptly as practicable following Effective Date and shall begin the Migration Process within one (1) Business Day following Effective Date. The parties agree to appoint the Migration Consultant to facilitate the Migration Process paid for by Seller.

(b) The Migration Process is complete upon the earlier of: (1) the Buyer, in its sole discretion and in good faith, determines that a sufficient portion of the Assets have been transferred to Buyer or (2) the Buyer is able to ship an amount equal to or greater than the sales in the trailing seven (7) days on the following products: (1) "Chalk City Sidewalk Chalk, 20 count, 7 different colors, jumbo chalk, non-toxic, washable, art set" listing currently ASIN B071CKSMS7 and (2) Chalk City Sidewalk Chalk, 136 Count,17 Different Colors, Jumbo Chalk, Non-Toxic, Washable, Art Set listing currently ASIN B07228228H ("**Completed Migration**"). It is possible that some portion of the Assets will continue to be transferred to Buyer after the Completed Migration.

(c) Either Party's failure to complete the Migration Process after execution of this Agreement is a material breach of the Agreement; and,

(d) The Parties agree to provide each other all necessary information upon request to facilitate the Migration Process.

(8) **Release of the Purchase Price**. After the Completed Migration and in accordance with the Escrow Agreement, the Escrow Agent will release the Upfront Payment to the Seller in accordance with the terms of the Escrow Agreement.

(9) **Reconciliation of Inventory Payment and Amazon Accounts**.

(a) The Parties understand and agree that Buyer owns the Assets on the Effective Date. However, Parties understand and agree that revenue associated with the Assets may continue to accumulate in Seller's Amazon account ("**Residual Amazon Revenue**").

(b) The Parties understand and agree the Inventory Payment is based on an estimate of the value of the Inventory. However, fluctuations in the value and amount of Inventory may occur between up to the Effective Date of this Agreement which may cause the Inventory Payment to be inaccurate ("**Inventory Discrepancies**").

(c) Within sixty (60) days following the Completed Migration, Seller shall prepare and deliver to Buyer a statement (the "**Adjustment Statement**") setting forth Seller's good faith calculation of (i) the Residual Amazon Revenue and (ii) Inventory Discrepancies, if any together with reasonable documentation supporting the information set forth in the Adjustment Statement.

    (d)    After delivery of the Adjustment Statement, Buyer and its accountants shall be permitted to make inquiries of Seller and its accountants regarding questions concerning, or disagreements with respect to, the Adjustment Statement. If Buyer has any objections to the Adjustment Statement, then Buyer shall deliver to Seller a statement (an "**Adjustment Objection Statement**") setting forth its disputes or objections (the "**Adjustment Disputes**") to the Adjustment Statement and, to the extent practical, Buyer's proposed resolution of each such Adjustment Dispute. If an Adjustment Objection Statement is not delivered to Seller within fourteen (14) days after delivery of the Adjustment Statement, then the Adjustment Statement as originally delivered by Seller shall be final, binding and non-appealable by the parties. If an Adjustment Objection Statement is timely delivered, then Buyer and Seller shall negotiate in good faith to resolve any Adjustment Disputes, but if they do not reach a final resolution within thirty (30) days after the delivery of the Adjustment Objection Statement, Seller and Buyer shall engage and submit each unresolved Adjustment Dispute to the Independent Auditor to resolve such Adjustment Disputes. The Independent Auditor shall be instructed to set forth a procedure to provide for prompt resolution of any unresolved Adjustment Disputes and, in any event, to make its determination in respect of such Adjustment Disputes within thirty (30) days following its retention. The Independent Auditor shall only consider those items in the Adjustment Objection Statement that remain in dispute at the time of its engagement, shall resolve each such item within the range difference between Buyer and Seller, and shall make its determination based solely on the presentations by Buyer and Seller and not by independent review. The Independent Auditor's determination of such Adjustment Disputes shall be final and binding and non-appealable upon the parties. The fees and expenses of the Independent Auditor shall be paid by Seller, on the one hand, and by Buyer, on the other hand, based upon the percentage that the amount actually contested but not awarded to Seller or Buyer, respectively, bears to the aggregate amount actually contested by Seller and Buyer.

(10)    **Post-Closing Cooperation.** At any time or from time to time after the Effective Date, at either party's request, without further consideration, the other party shall execute and deliver to such party such other instruments of sale, transfer, conveyance, assignment and confirmation and provide such other reasonable assistance and cooperation as may be reasonably requested by such party in order to more effectively transfer, convey and assign to Buyer all of the Assets and to put Buyer in actual possession and operating control of the Assets. Such assistance and cooperation shall include transfer of all intellectual property, website domains, website hosting agreements, transfer of intellectual property and introductions to

customers, users, vendors, industry experts and other individuals and entities related to the conduct of the Business.

(11) **Buyer Default**.

(a) The following shall be deemed an event of Buyer's Default: 1) Buyer fails to timely complete the Deferred Payment; 2) Buyer breaches a term of this Agreement; 3) if prior to completing the required Deferred Payment Buyer or another person shall file a petition for relief for Buyer under the bankruptcy laws, or shall make an assignment for the benefit of creditors for Buyer, or if a receiver of any property of the Buyer be appointed in any action, suit or proceeding by or against Buyer, or if Buyer shall admit to any creditor or to Buyer that it is insolvent, or if the interest of Buyer in the Assets shall be sold under execution or other legal process.

(b) Upon the occurrence of an event of Default, Seller shall have the right to terminate the Agreement and shall be entitled to full possession of the Assets.  Seller may make its election to terminate known to Buyer by delivery of a notice of termination to Buyer and a notice to the Escrow Agent to transfer any of the Assets to Seller, if the Escrow Agent is in possession of any Assets. Such termination shall be immediately effective and Seller shall be entitled to forthwith commence an action in summary proceedings to recover possession of the Assets. Buyer agrees to fully comply and cooperate to transfer the Assets to Seller. Upon the occurrence of an event of Default, Buyer is not entitled to any refund of any portion of the Purchase Price. Further, the Parties agree Escrow Agent is not liable in any manner whatsoever for its transfer of any Assets to Seller consistent with this Agreement.

(c) Anything contained in this Agreement to the contrary notwithstanding, on the occurrence of an event of Default, the Seller or the Escrow Agent shall not exercise any right or remedy under any provision of this Agreement or applicable law unless and until: (a) the Seller or the Escrow Agent has given written notice thereof to the Buyer, and (b) the Buyer has failed to cure the event of default within five (5) days.

(12) **Seller Warranties.** Seller warrants that:

(a) Seller has the full power and legal authority to execute this Agreement.

(b) Seller is tax resident exclusively in the United States and it does not maintain a permanent establishment in any other jurisdiction.

(c) Seller has clear and unencumbered title to the Assets and all related assets, including all intellectual property rights;

- (d) Seller has not placed the Assets to be sold subject to a mortgage, pledge, lien, or encumbrance, except for those sales taxes which shall be prorated as of the date of the Completed Migration;

- (e) Seller has truthfully and accurately provided details relating to the Assets to the Buyer including, but not limited to, details regarding revenue, profit, expenses, pageviews, work required per week, creation date, and use of a private blog network, if any;

- (f) There are no bankruptcy or reorganization proceedings currently filed against Seller that would impede its ability to complete this Agreement; and,

- (g) There is no lawsuit or pending charge against the Asset.

(13) **Maintenance of the Assets**.

- (a) Seller agrees to maintain the Assets, as it was leading up to sale, through the Completed Migration to the best of its ability. This includes, but is not limited to, maintaining third party links on its website and other websites and any marketing, advertising, or other referral source, if applicable. Seller shall take no active action to remove any third-party links;

- (b) Seller agrees to maintain accurate and up-to-date Assets records that it compiles throughout its normal course of business through the Completed Migration, and deliver any and all Assets records to Buyer prior to the Completed Migration; and,

- (c) Seller agrees not to take any actions in relation to the Assets outside of normal business practices throughout the Migration Process.

(14) Buyer Obligations.

- (a) Buyer will pay Escrow Agent all fees incurred for Escrow Agent's obligations under the Escrow Agreement.

- (b) Buyer agrees it will make all possible good faith efforts to achieve income levels that will trigger the Deferred Payment. This includes but is not limited to maintaining sufficient inventories available for sale on Amazon; maintaining sufficient advertising to sustain market share; expanding into new markets; and not taking any bad faith action, the specific intention of which is to knowingly reduce the amount. Seller's sole remedy for Buyer's breach of this section, will be complete payment of the full possible Deferred Payment.

(15) **Buyer Warranties**. Buyer warrants that:

(a) Buyer has full power and legal authority to execute this Agreement;

(b) Buyer has sufficient funds to complete the transaction at the Purchase Price;

(c) There are no bankruptcy or reorganization proceedings currently filed against Buyer that would impede its ability to complete this Agreement;

(d) None of Buyer's actions in executing this Agreement will violate or have violated any laws or agreements;

(e) Buyer has had the opportunity to fully inspect the Assets for sale and has conducted an acceptable amount of due diligence into the purchase and wishes to purchase the Assets at the Purchase Price; and,

(f) Buyer is aware of the risks involved with purchasing the Assets.

(16) **No Contingencies.** Except as otherwise provided by this Agreement, Buyer had the opportunity to fully inspect the Assets, is satisfied with its inspection, and desires to purchase the Assets. Buyer agrees to buy the Assets "as is." The Buyer hereby waives any and all contingencies in connection with its purchase of the Assets, including any discrepancies, fluctuations, or changes in the performance of the Assets and specifically its gross revenue, net revenue, expenses, traffic, and other metrics of performance, including any discrepancies, fluctuations, or changes in the performance of the Assets during the Migration Process.

(17) **Remedies for Material Breach**. The Parties understand and agree that monetary damages may not be a sufficient remedy for any breach of this Agreement and that, in addition to monetary damages and all other rights and remedies available at law or according to the terms of this Agreement, the non-breaching Party shall be entitled to seek equitable relief, including injunctive relief, specific performance and/or the granting of an immediate restraining order or preliminary injunction (without posting bond) enjoining any such breach or reasonably anticipated breach as a remedy. Such equitable remedies shall not be the exclusive remedies available to the Parties for breach of this Agreement, but shall be in addition to all other remedies available according to the terms of this Agreement.

(18) **Non-Compete Agreement.**

For a period of two (2) years commencing on the Effective Date (the "**Restricted Period**"), Seller shall not: (i) engage in or assist others in engaging in any activity in competition with the Business (i.e. sale of the sidewalk chalk);

or (ii) have a direct interest in any Person that engages in competition with the Business.

Seller acknowledges that a breach or threatened breach of this Section 15 may give rise to irreparable harm to Buyer, for which monetary damages may not be an adequate remedy, and hereby agrees that in the event of a breach or a threatened breach by Seller of any such obligations, Buyer shall, in addition to any and all other rights and remedies that may be available to it in respect of such breach, be entitled to seek equitable relief, including a temporary restraining order, an injunction, specific performance and any other relief that may be available from a court of competent jurisdiction (without any requirement to post bond).

Seller acknowledges that the restrictions contained in this Section 15 are reasonable and necessary to protect the legitimate interests of Buyer and constitute a material inducement to Buyer to enter into this Agreement and consummate the transactions contemplated by this Agreement. In the event that any covenant contained in this Section 15 should ever be adjudicated to exceed the time, geographic, product or service or other limitations permitted by applicable Law in any jurisdiction, then any court is expressly empowered to reform such covenant, and such covenant shall be deemed reformed, in such jurisdiction to the maximum time, geographic, product or service or other limitations permitted by applicable law. The invalidity or unenforceability of any such covenant or provision as written shall not invalidate or render unenforceable the remaining covenants or provisions hereof, and any such invalidity or unenforceability in any jurisdiction shall not invalidate or render unenforceable such covenant or provision in any other jurisdiction.

(19) **Indemnification.**

    (a)    Buyer agrees to indemnify Seller from all claims, damages, liabilities and losses arising out of Buyer's operation of the Assets after the Effective Date and any material breach of the Agreement; and

    (b)    Seller agrees to indemnify Buyer from all claims, damages, liabilities and losses arising out of Seller's operation of the Assets prior to the Effective Date and any material breach of the Agreement.

(20) **Notices**.  If any notification is required under this Agreement or by law, such notification shall be deemed reasonable and properly given as detailed below:

    (a)    Seller, notice effective the same day if delivered by email to michael@regalgamesllc.com with a copy to ted.roberts@aol.com

  (b)  Buyer, notice effective the same day if delivered by email to legal@sellerx.com with a copy to tomasz@sellerx.com.

or at such other address as shall be given in writing by one party to the others.

(21) **General Provisions.**

  (a)  <u>Fair Market Value.</u> The Parties each acknowledge the Purchase Price represents fair market value.

  (b)  <u>Costs.</u> The Parties agree to pay their own costs and expenses incurred with respect to this Agreement. The Seller agrees to reimburse the Buyer for any reasonable, document, out of pocket costs incurred in connection with the transfer of ASINs listed in Schedule 1 including, but not limited to, additional shipping costs and relabeling Products up to $19,000.

  (c)  <u>Valid and Binding Agreement</u>. This Agreement represents a binding legal obligation and is enforceable in accordance with its terms and is binding and shall inure to the benefit of each Parties' respective heirs, legal representatives, successors, and assigns.

  (d)  <u>Confidentiality</u>. The terms of the nondisclosure agreement are hereby incorporated herein by reference and shall continue in full force and effect in all respects.

  (e)  <u>Waivers</u>. A waiver by either Party to any provision of this Agreement does not constitute a waiver of any other provision of this Agreement.

  (f)  <u>Notices.</u> Any notice required under this Agreement shall be in writing and shall be deemed properly given when emailed and sent by certified mail, return receipt requested, to the contact information contained in this Agreement.

  (g)  <u>Successors or Assigns</u>.  The parties agree that this Agreement shall be binding on their respective successors and assigns, and that the term "Seller" and the terms "Purchaser or Buyer" as used herein shall be deemed to include, for all purposes, the respective designees, successors, assigns, heirs, executors and administrators. Notwithstanding the foregoing, this Agreement and the rights and obligations of the parties hereunder shall not be assignable, in whole or in part, by either party without the prior written consent of the other party.

  (h)  <u>No Third-Party Beneficiaries.</u> Except as otherwise provided, nothing in this Agreement will provide any benefit to any third party or entitle

|     | any third party to any claim, cause of action, remedy, or right of any kind. This Agreement is not a third-party beneficiary contract. |
| --- | --- |
| (i) | <u>Invalidity of Particular Provisions</u>.  The unenforceability or invalidity of any provision or provisions of this Agreement shall not render any other provision or provisions herein or this Agreement itself invalid. |
| (j) | <u>Sections and Headings.</u> The sections and headings in this Agreement are for organization and clarification purposes only and should not be interpreted as part of this Agreement. |
| (k) | <u>Choice of Laws and Venue.</u> You agree that any and all claims arising out of or related to this Agreement, including its validity, interpretation, breach, violation, or termination, shall be brought in the exclusive forum of the state or federal courts located in New York County, New York and pursuant to New York law. The Parties expressly consent to personal and subject matter jurisdiction in this forum. The prevailing party is entitled to payment of its costs, expenses, and attorney fees by the non-prevailing party for actions, disputes, or litigation arising out of or related to this Agreement. |
| (l) | <u>Entire Agreement.</u> This Agreement is the entire agreement between the Parties. This Agreement supersedes any prior written or oral agreement between the Parties. |
| (m) | <u>Severability.</u> If any provision of this Agreement is held to be invalid or unenforceable for any reason, the remaining provisions will continue to be valid and enforceable. If a court finds that any provision of this Agreement is invalid or unenforceable, but that by limiting such provision it would become valid and enforceable, then such provision will be deemed to be written, construed, and enforced as so limited. |
| (n) | <u>Amendments.</u> This Agreement may be amended in writing if both Parties sign and date in writing. |

(22) **Understanding and Agreement**. The Parties had sufficient time and ability to be represented by legal counsel in connection with signing this Agreement, have read and understand the Agreement, and are signing this Agreement out of their own free will and volition.

IN WITNESS WHEREOF, the Buyer and the Seller have each executed and delivered this Agreement as of the Effective Date below.

DocuSign Envelope ID: 8470C290-074F-411D-AEC6-C878629DA34E

BUYER

*Malte Horeyseck*
BY: Malte Horeyseck
ITS: Director

Date: 12-Apr-21 | 21:31 PDT

SELLER

*Michael Roberts*
BY: Michael Roberts
ITS: President

Date: 12-Apr-21 | 14:06 PDT

## Schedule 1

| ASIN | Item Number | Product Description |
|---|---|---|
| B07228228H | 8104 | Chalk City Sidewalk Chalk, 136 Count, 17 Different Colors, Jumbo Chalk, Non-Toxic, Washable, Art Set |
| B071CKSMS7 | 8101 | Chalk City Sidewalk Chalk, 20 Count, 7 Different Colors, Jumbo Chalk, Non-Toxic, Washable, Art Set |
| B078SG5JTR | 8103 | Chalk City Sidewalk Chalk, 30 Count, 3 Different Colors, Jumbo Chalk, Non-Toxic, Washable, Art Set |
| B08FXVS8TZ | 8106 | Chalk City Sidewalk Chalk, 52 Count, 12 Colors, Jumbo Chalk, Non-Toxic, Washable, Art Set |
| B08L45QB1L | 8109 | Regal Games Sidewalk Neon Chalk, 20 Count Chalk, Jumbo Chalk, Washable, Art Set |
| B08L45CXLY | 8107 | Regal Games Sidewalk Tie Dye Chalk, 20 Count Chalk, Jumbo Chalk, Washable, Art Set |
| B08L45NGNN | 8108 | Regal Games Sidewalk Glitter Chalk, 20 Count Chalk, Jumbo Chalk, Washable, Art Set |
| B08L45KLDF | 8110 | Regal Games Sidewalk Chalk, Variety Art Pack of Glitter, Neon, Tie Dye, and Original Chalks (4 buckets of 20 count) |
| N/A | 8111 | 6 Pack Egg Chalk STD Colors |
| N/A | 8112 | 6 Pack Egg Chalk Neon Colors |
| N/A | 8113 | 6 Pack Egg Chalk Glitter |
| N/A | 8114 | 6 Pack Egg Chalk Tie Dye |
| N/A | 8115 | 12 Pack (3 Each 4 Styles) Egg Chalk |

## Schedule 2

| U.S. Trademark Registration Number | Description |
|---|---|
| 88398937 | Chalk City |

| U.S. Patent Registration Number | Description |
|---|---|
| D623,079 S | Road Maker |