# EXHIBIT D

**MORRISON FOERSTER**

250 WEST 55TH STREET
NEW YORK
NEW YORK  10019-9601

TELEPHONE: 212.468.8000
FACSIMILE: 212.468.7900

WWW.MOFO.COM

MORRISON & FOERSTER LLP

AUSTIN, BEIJING, BERLIN, BOSTON,
BRUSSELS, DENVER, HONG KONG,
LONDON, LOS ANGELES, NEW YORK,
PALO ALTO, SAN DIEGO, SAN FRANCISCO,
SHANGHAI, SINGAPORE, TOKYO,
WASHINGTON, D.C.

June 13, 2022

Writer's Direct Contact
+1 (212) 336-4069
DFioccola@mofo.com

**Via Email**

Michael Roberts
Managing Member
Regal Games LLC
michael@regalgamesllc.com

Re:   Chalk City Deferred Payment

Dear Michael:

We have been retained by Seller X Eight GmbH ("SellerX") as litigation counsel.  We have reviewed your May 9, 2022 email (the "May 9 Email") to Dr. Krzywicki regarding alleged breaches by SellerX of the April 1, 2021 Asset Purchase Agreement (the "Agreement" or the "APA") entered into between SellerX and Regal Games, LLC ("Regal") in which Regal sold to Seller X a business consisting of select sidewalk chalk products ("Chalk City").  We write in response to your assertions in the May 9 Email, none of which has any merit, and all of which are based on either a misunderstanding of the facts, the applicable law, or both.  If you have retained counsel for this matter, please identify them to us so we can direct all future communications to them.

SellerX's and Regal's incentives were aligned here.  SellerX intended for Chalk City to succeed so that SellerX would realize the benefit of its investment.  Upon that success, Regal would have been entitled to the Deferred Payment.  Thus, your contention that SellerX intentionally sabotaged Chalk City to avoid paying Regal $900,000 makes no rational sense, business or otherwise.  *See Keene Corp. v. Bogan*, 1990 U.S. Dist. LEXIS 220 (S.D.N.Y. Jan. 11, 1990) (no violation of the covenant of good faith and fair dealing when purchaser had no economic incentive to lose money and there was no evidence to support "bizarre scenario" that purchaser acted against its own self-interest in order to lose money and thus deprive seller of earn-out payment).

As explained in more detail below, SellerX has at all times abided by its obligations in the Agreement and has acted in good faith.

**MORRISON FOERSTER**

Michael Roberts
June 13, 2022
Page Two

### Changes in the Market

The May 9 Email omits significant, highly relevant information regarding changes in the competitive landscape and marketplace that bears directly on your assertion that SellerX has breached its contractual obligations to Regal, and that but for such breach, "the benchmarks to entitle Regal to receive the full $900,000.00 Deferred Payment would have been easily satisfied." (May 9 Email at 3.)

Overall increased competition on the already price sensitive Kids' Drawing Chalk Amazon product category has led to decreased profits for market participants, not just SellerX. Notably, Amazon Retail launched its own chalk products in the second half of 2021 with extremely low prices that has made it difficult for competitors like SellerX to compete effectively. For instance, Amazon Retail introduced a product that directly competes with SellerX's best-selling product ASIN B071CKSMS7 and which it sold for $2.97. SellerX was offering ASIN B071CKSMS7 for $9.99, but at that price, it incurred Amazon fees and commissions of $5.90 per unit for each sale of the product. JoyinDirect, another competitor in this product category, also took aggressive pricing action, cutting its prices by 33% or more. None of this was within SellerX's control and SellerX cannot be said to have breached any obligation to Regal because of any decline in Chalk City's business caused by these market forces.

### SellerX Did Not Breach Its Obligations Under Section (14)(b) of the Agreement

It is well established, in the context of earn-out payments and purchase agreements that include deferred compensations structures, that "good faith" under New York law does not "undermine a party's general right to act in its own interest in a way that may incidentally lessen the other party's anticipated traits from the contract." *Lykins v. Impco Techs.*, 2018 U.S. Dist. LEXIS 111705 (S.D.N.Y. Mar. 6, 2018). That SellerX's obligation to act in good faith derives from an express provision in the Agreement rather than from the implied covenant of good faith and fair dealing incorporated into all contracts governed by New York law does not alter what "good faith" requires of SellerX. *See Barbara v. MarineMax, Inc.*, 2013 U.S. Dist. Lexis 120286 (E.D.N.Y. Aug. 22, 2013) (". . . because there is no contract provision defining 'good faith' the term may be construed to have the same meaning it does in the implied covenant context."). Regal cannot show that SellerX acted in bad faith, thus, it cannot show any violation of this section of the Agreement. *See Wagner v. JP Morgan Chase Bank*, 2011 U.S. Dist. LEXIS 24518 (S.D.N.Y. Mar. 9, 2011) ("Courts have consistently found that acquisition agreements containing earn-out provisions are not violated by a defendant's alleged mismanagement where the plaintiff has failed to produce evidence of bad faith.")

**MORRISON FOERSTER**

Michael Roberts
June 13, 2022
Page Three

To the extent the May 9 Email intends to suggest that SellerX had any obligation to follow any "plans laid out for Chalk City" that were discussed during negotiations of the APA (May 9 Email at 1), it ignores Section (21)(l) of the APA, which specifically provides that the APA "is the entire agreement between the Parties.  The Agreement supersedes any prior written or oral agreement between the Parties."  Because these "plans" are not part of the Agreement between the parties, they cannot form the basis of any breach.  If Regal believed that these "plans" were necessary to the continued success of Chalk City, including any specific minimum thresholds for advertising spending, any specific inventory levels, or any specific timelines for entrance into new markets, Regal was free to bargain with SellerX to include those plans in the APA.  Regal chose not to do so.

We address your specific claims regarding what was required of SellerX in terms of advertising, inventory levels, and entrance into new markets below.

*Advertising*

Section (14)(b) only provides that SellerX "will make all possible good faith efforts to achieve income levels that will trigger the Deferred Payment.  This includes . . . maintaining sufficient advertising to sustain market share."  SellerX continued to have a right to act in its own interest (*see Lykins v. Impco Techs*.) which was nevertheless aligned with Regal's interest in the continued success of Chalk City.

Simply put, there was no level of advertising that would have allowed SellerX to maintain market share in light of the changes in the market place discussed above.  Thus, SellerX was not required, in the face of strong headwinds entirely out of its control, to continue to spend advertising dollars to try to prop up the market share of any product whose market share was eroding, or of Chalk City as a whole.  SellerX specifically denies that any reduction in advertising spending caused any reduction in market share.

Further, "sustain market share" does not and cannot mean that, in the face of the marketplace effects outside of SellerX's control, that SellerX was required to spend an uncapped amount of money to try to keep sales at any prior level.  Indeed, the APA does not specify at which point in time "market share" is to be measured and, in light of the meaning of "good faith" under New York law, this provision must be read to mean that, all else being equal, Seller X may not reduce its advertising spending such that market share is affirmatively reduced.  It further does not exclude the measurement of market share as a percentage.  Accordingly, nothing in the May 9 Email indicates that SellerX has violated Section (14)(b) with respect to advertising, including any supposed "direct correlation" you contend exists between a reduction in direct advertising expenditures and a reduction in sales.

**MORRISON FOERSTER**

Michael Roberts
June 13, 2022
Page Four

*Inventory*

SellerX has always maintained sufficient inventories available for sale on Amazon. That is all that is required by Section (14)(b) of the APA. In the May 9 Email you mention only purported inventory shortfalls in March and April 2022, which SellerX specifically disputes.

Although SellerX did not have data regarding demand for the Easter season available to it, SellerX nevertheless was able, based on its best estimates, to maintain sufficient inventory to provide for sales to customers through Amazon's online marketplace. As you are likely aware, during the 2022 Easter season, SellerX had to take significant efforts to manage and maintain inventory levels because of actions it took at Regal's request. Regal unexpectedly asked that SellerX fulfill a large wholesale order outside of Chalk City's customary sales channels, which ultimately led to SellerX needing to take limited, temporary measures to maintain in-stock status for its products. Such measures do not violate any term or provision of the APA.

And, even if any of the inventories available on Amazon of Chalk City brand products did run to zero for a limited period of time, this does not mean that SellerX has failed to maintain "sufficient inventories" of Chalk City products on Amazon under Section (14)(b). Section (14)(b) does not impose any duty on SellerX to maintain any specific inventory levels of any specific products at any specific time. No such requirement is included in the APA, either in Section (14)(b) or elsewhere, and Regal cannot impose any such obligation on SellerX through reference to "discussions" it had with SellerX. Instead, all that is required is that SellerX, in good faith, "maintain[] sufficient inventories for sale on Amazon," so as to endeavor to "achieve income levels that will trigger the Deferred Payment." SellerX did just that.

*Expansion into New Markets*

Section (14)(b) only provides that SellerX would "expand[] into new markets," which it has taken expeditious steps to do, including by managing the compliance and legal requirements necessary to obtain the required certifications for the chalk products prior to shipping the products from China to Europe. The APA includes no express deadline for SellerX to complete any sales in Europe. Thus, it entirely irrelevant whether any sales in Europe had been made prior to the May 9 Email. Further, Regal cannot base any claim of breach of Section 14(b)'s provisions related to expansion into new markets or any other section of the APA based on any representations made to you by SellerX during the negotiations of the APA in light of Section (21)(l) of the APA. Your claim of breach based on any failure to expand into new markets is therefore entirely without merit.

**MORRISON FOERSTER**

Michael Roberts
June 13, 2022
Page Five

**Regal Cannot Bring Suit for Violation of Section (14)(b)**

As discussed above, SellerX expressly denies any and all allegations that it has breached any of its obligations under the Agreement, mismanaged the Chalk City business, or otherwise deprived Regal of any benefits of the bargain it sought in agreeing to either the Deferred Payment or Earn-Out Payment.  To the extent Regal continues to believe otherwise, the Agreement is clear that it must bring its dispute before an independent auditor pursuant to Section (5) of the APA, as this dispute concerns the amount owed to Regal under the Deferred Payment and Earn-Out Payment provisions of the APA.  This section, among other things, requires Regal and SellerX to negotiate in good faith to resolve their dispute.  If the parties are unable to reach a negotiated resolution, then the parties "shall engage and submit each unresolved Payment Dispute to [the Independent Auditor].  The Independent Auditor then is to resolve the dispute, with such determination being "final and binding and non-appealable upon the parties."  (APA Section (5).)  SellerX will continue to act in good faith, as it has throughout the time it has owned Chalk City, to attempt to resolve this dispute with Regal.

Finally, SellerX has sent you additional, reasonable supporting documents for its Earn-Out and Deferred payment calculation under separate cover.  Please let us know if you have questions upon receipt of that information.

Sincerely,

*/s/ David J. Fioccola*

David J. Fioccola
Partner