# EXHIBIT E



ALESSANDRA CARCATERRA MESSING, ESQ.
MESSING, P.C.
31 HOWARD STREET, 2ND FLOOR
NEW YORK, NY 10013
ALESSANDRA@MESSING.LAW

June 22, 2022

*VIA ELECTRONIC MAIL ONLY (dfioccola@mofo.com)*
David J. Fioccola, Esq.
Morrison & Foerster LLP
250 West 55th Street
New York, NY 10019-9601

**Re:   Demand For Immediate Payment and Return of Assets Transferred Pursuant to the Asset Purchase Agreement by and between Regal Games, LLC and SellerX Eight GmbH**

Dear Mr. Fioccola:

Please be advised that this firm is litigation counsel to Regal Games, LLC ("Regal Games") in connection with the above-referenced matter. Please direct all further correspondence to my attention.

We are in receipt of your letter dated June 13, 2022, wherein you counterfactually allege that SellerX Eight GmbH ("SellerX") has performed its obligations under the Asset Purchase Agreement by and between Regal Games and SellerX, having an effective date of April 1, 2021 (the "APA," attached hereto as Exhibit A for convenience). As set forth in more detail below, SellerX has failed to meet its obligations under the APA and has committed material breaches of the agreement. As discussed further below, in accordance with the operative provisions of the APA, SellerX must make payment of the Deferred Payment to Regal Games by Monday, June 27, 2022 in order to avoid litigation.

As an initial matter, your June 13 letter asserts that Mr. Roberts' May 9, 2022 email notifying SellerX of its breaches omits relevant information related to changes in the market for the Kids' Drawing Chalk Amazon product category, *i.e.*, the relevant sidewalk chalk market. Contrary to your allegations, foreseeable changes to the sidewalk chalk market, including increased competition, do not excuse SellerX from meeting the obligations explicitly agreed to by the parties and specifically enumerated in the APA. SellerX is in the business of aggregating Amazon businesses, purportedly with the intention to grow the brands that it acquires. Thus, SellerX cannot reasonably claim that it could not have anticipated increased price competition in the sidewalk chalk market at the time it entered into the APA.



David J. Fioccola, Esq.
Morrison & Foerster LLP
June 22, 2022
Page 2 of 14

Because its entire model centers on buying out businesses and product lines sold on the Amazon marketplace, SellerX knew, or should have known, that Amazon Retail's (temporary) entrance into the sidewalk chalk market with its own lower priced competing product was a very likely possibility, if not a guaranteed eventuality, and accounted for that scenario. SellerX's failure to properly plan for highly likely and foreseeable shifts in the market does not excuse SellerX from meeting its explicit obligations under the APA. If SellerX wished to be excused from performance based on market conditions, it should have negotiated for a force majeure clause addressing such a scenario. Moreover, Regal Games' Amazon strategy — which it repeatedly conveyed, in detail, to SellerX — expressly relied upon periods of little or no profitability in order to reap windfall profits when the competition exhausted itself. SellerX chose to disregard this strategy, being pennywise but pound foolish. That was a self-inflicted wound.

As discussed further below, SellerX's breaches include its failure to make "***all possible good faith efforts*** to achieve income levels that will trigger the Deferred Payment," as required by Section 14(b) of the APA. That section specifically states that SellerX's obligations include but are not limited to "maintaining sufficient inventories available for sale on Amazon; maintaining sufficient advertising to sustain market share; [and] expanding into new markets . . . ." Each of the foregoing are specific covenants that SellerX was required to undertake, and which it knowingly and intentionally failed to perform. You admit as much in your letter. SellerX reduced its advertising and failed to sustain market share. SellerX failed to maintain sufficient inventory to make sales on Amazon. SellerX failed to expand to new markets. In short, SellerX failed to take the actions specifically prescribed in the APA, despite having full knowledge that its enumerated obligations were key to the successful business strategy that Regal Games utilized to become one of the leading sidewalk chalk brands on Amazon.

### I.    SellerX's Failure to Make All Possible Good Faith Efforts To Achieve the Deferred Payment

In order to disincentivize gamesmanship, manipulation, and malicious and/or bad faith actions, the parties explicitly agreed that SellerX was required to "make ***all possible good faith efforts*** to achieve income levels that [would] trigger the Deferred Payment." As noted above, the parties explicitly agreed that such good faith efforts necessarily included, but were not limited to, "maintaining sufficient



David J. Fioccola, Esq.
Morrison & Foerster LLP
June 22, 2022
Page 3 of 14

inventories available for sale on Amazon; maintaining sufficient advertising to sustain market share; expanding into new markets; and not taking any bad faith action, the specific intention of which [was] to knowingly reduce the amount [of the Deferred Payment]." I address SellerX's failures related to inventory levels, advertising, and expansion into new markets in turn below, but first I will respond your misplaced reliance on case law related to the covenant of good faith and fair dealing.

The cases you reply upon in your June 13 letter are inapposite. None of them deal with explicit contractual requirements, or even refer to a best-efforts clause, except tangentially. New York law is unambiguous with respect to explicit, written contractual obligations and the plain terms of the APA govern the parties' obligations. *See, e.g., Holland Loader Co., LLC v. FLSmidth A/S*, 313 F. Supp. 3d 447, 466 (S.D.N.Y. 2018), *aff'd*, 769 F. App'x 40 (2d Cir. 2019) (citations omitted) ("The fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent . . . . [and t]he best evidence of what parties to a written agreement intend is what they say in their writing."); *see also Network Publishing Corp. v. Shapiro*, 895 F.2d 97, 99 (2d Cir. 1990) ("[W]e must consider the words [of a contract] themselves for they are always the most important evidence of the parties' intention.") (citations omitted) (alterations in original). Clearly, based on the explicit provisions in the APA, the parties' intent was that SellerX would *at a bare minimum* (i) maintain sufficient inventories available for sale on Amazon, (ii) maintain sufficient advertising to sustain Chalk City's market share, and (iii) expand into new markets, which actions would demonstrate that SellerX was taking all possible good faith efforts to achieve income levels to trigger the Deferred Payment. Unfortunately, SellerX chose not to do any of the foregoing.

*Keene Corp. v. Bogan*, *Lykins v. Impco Techs*, *Barbara v. Marine Max, Inc.*, and *Wagner v. JP Morgan Chase Bank*[1] are inapplicable, as each case concerns the implied duty of good faith and fair dealing. The implied duty of good faith and fair dealing is, of course, an *implied* covenant. Those cases clearly do not govern here because SellerX breached clearly defined obligations. There is no need to consider implied duties where a party's obligations are explicitly defined in the agreement at

---

[1] In *Wagner v. JP Morgan Chase Bank*, Judge Sullivan specifically noted in his opinion that there was "no credible evidence that this [best efforts] provision . . . [was intended] to apply to the earn-out payments." It is unclear why SellerX would rely on a plainly inapplicable case.



David J. Fioccola, Esq.
Morrison & Foerster LLP
June 22, 2022
Page 4 of 14

issue, as you know from the cases you cited. *See*, *e.g.*, *Barbara v. MarineMax*, *Inc.*, 2013 U.S. Dist. Lexis 120286 (E.D.N.Y. Aug. 22, 2013) ("Integral to a finding of a breach of the [implied good faith and fair dealing] covenant is a party's action that directly violates an obligation *that may be presumed to have been intended by the parties.*") (quoting *M/A-COM Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990)) (emphasis added).

There can be no doubt about what the parties intended, given that SellerX's obligations in the APA are explicit. *See Holland Loader Co.*, 313 F. Supp. 3d at 473 ("The best evidence of what parties to a written agreement intend is what they say in their writing."). In any event, should Regal Games invoke SellerX's obligation of good faith and fair dealing, "the implied duty [would] not [be] invoked to create a new obligation, but to measure compliance with an explicit contract obligation." *Travellers Int'l A.G. v. Trans World Airlines*, 41 F.3d 1570, 1576 (2d Cir. 1994). Even under the lens of the implied duty of good faith and fair dealing, SellerX failed to meet its obligations, as detailed below.

Further, in addition to the explicit contractual obligations, the parties imposed an elevated form of "best efforts" clause on SellerX. In other words, the language agreed to by the parties dictates a higher bar than the often-litigated "best efforts" standard and, resultantly, SellerX is irrefutably in breach. Even under the standard "best efforts" language, SellerX's position is untenable. Courts have made clear that "difficulty of performance occasioned only by financial difficulties, *even to the extent of insolvency*, does not excuse performance of a contract." *Showtime Inc. v. Comsat Video Enterprises*, *Inc.*, 1998 N.Y. Misc. LEXIS 732, at *12 (N.Y. Sup. Ct. June 29, 1998), *aff'd*, (quoting *407 East 61st Garage*, *Inc. v. Savoy Fifth Ave. Corp.*, 23 N.Y.2d 275, 282 (1968)) (emphasis added); *see also Pfizer Inc. v. PCS Health Systems*, *Inc.*, 234 A.D.2d 18, 19, 650 N.Y.S.2d 164 (1st Dept. 1996) (defendant still bound even if contract has become disadvantageous to defendant). Notably, SellerX has not claimed — because it cannot — that maintaining the required advertising spend, or meeting any of the other enumerated obligations, would have bankrupted or even substantially impaired the company.[2] Rather, you've made unsubstantiated

---

[2] SellerX boasts about its "unicorn valuation" and recent $500 million raise, *see* https://sellerx.com/sellerx-raises-500-million-in-additional-financing-acquires-kw-commerce/, last accessed on June 22, 2022, so SellerX's failings were clearly not driven by financial necessity.



David J. Fioccola, Esq.
Morrison & Foerster LLP
June 22, 2022
Page 5 of 14

(and candidly absurd[3]) claims that "there was no level of advertising that would have allowed SellerX to maintain market share in light of the changes in the marketplace discussed above."[4] The problem is, SellerX did not even try. In *Showtime Networks Inc. v. Comsat Video Enterprises, Inc.*, the court held that the undertaking party was not excused from taking the required action merely because it is unprofitable. 1998 N.Y. Misc. LEXIS 732, at *12. Likewise, SellerX was not excused from its explicit obligations simply because the sidewalk chalk market predictably became more competitive during the Trailing Period. SellerX knew or should have known that that Amazon Retail's appearance in the commodity chalk market was temporary, and that it needed to ride out the figurative storm by maintaining Chalk City's position, so it could recapture the share taken by Amazon and once again reap profits. SellerX also knew that it needed to expend money to fend off a competitor's attempt to steal Chalk City's market share (using the strategy that Chalk City had previously executed). But SellerX instead chose to ignore the strategy and renege on the deal.

Many similarly situated buyers have made comparable ill-fated calculations and accordingly, the case law in New York related to these issues is extensive. *See, e.g.*, *CSI Inv. Partners II, L.P. v. Cendant Corp.*, 507 F. Supp. 2d 384, 413-14 (S.D.N.Y. 2007), subsequently aff'd, 328 F. App'x 56 (2d Cir. 2009) (holding that defendant breached the best efforts provision as a matter of law by making "overwhelming cuts" to the marketing campaign of the product in question and rejecting defendant's argument that the reduction in marketing support at issue was excused by profitability concerns with respect to historical marketing practices); *see also 3DT Holdings LLC v. Bard Access Sys. Inc.*, No. 17-CV-5463 (LJL), 2022 WL 409082, at *9 (S.D.N.Y. Feb. 10, 2022) (finding that the defendant could not simply stop supporting the product at issue out of concerns for commercial practicality); *SATCOM Int'l Grp. PLC v. ORBCOMM Int'l Partners, L.P.*, No. 98CIV.9095(DLC), 2000 WL 729110, at *19-21 (S.D.N.Y. June 6, 2000) (rejecting defendants' argument that they were excused from meeting their contractual marketing obligations pursuant to a best efforts provision).

---

[3] *See* footnote 2 supra.

[4] In fact, there was. Please see the discussion below regarding Joyin Toys and its successful execution of Regal Games' strategy, which was eased by SellerX's inexplicable decision to cede the market in the face of competition.



David J. Fioccola, Esq.
Morrison & Foerster LLP
June 22, 2022
Page 6 of 14

### a.  Market Share

It cannot be reasonably disputed that SellerX allowed Chalk City's market share to erode.

As alluded to earlier, SellerX was well-aware that Regal Games' successful control of the Amazon sidewalk chalk market was achieved by buying as much advertising as possible and driving competitors to make max bids to win advertising placement, which in turn made competitors' sales uneconomical, obliging them to concede the marketplace. Rather than pursuing the successful strategy spoon-fed to it by Regal Games, SellerX promptly abandoned the strategy when Joyin Toy competed for advertising space, thereby allowing Joyin Toy to win the advertising at much lower bids. Similarly, it failed to match Joyin Toys' price cuts, allowing Joyin Toy to significantly improve its standing in Amazon's organic search results. In short, SellerX shortsightedly focused on near-term profits and knowingly abandoned the advertising strategy, with predictable results: sales fell, Chalk City's organic positions dissipated, and Joyin Toy took Chalk City's market share.

For reference, the below chart, compiled using data from Helium 10, clearly illustrates the extent to which SellerX allowed market share to be squandered. Note that during the Easter season of 2022, Joyin Toy outperformed the sum of Chalk City's Easter season in 2021, Chalk City's Easter season in 2022, *and* Joyin Toy's Easter season in 2021, demonstrating the continued health and viability of the chalk market on Amazon.



David J. Fioccola, Esq.
Morrison & Foerster LLP
June 22, 2022
Page 7 of 14



In contrast to SellerX's missteps, Joyin Toy executed Regal Games' playbook to perfection, aided in no small part by SellerX's breaches of the APA. Joyin Toy cut their prices while increasing advertising because they were trying to maintain or grow market share while working to discourage new competitors. Inexplicably, SellerX simply conceded market share to Joyin Toy by *reducing* advertising spend and consequently allowing organic search listings to suffer. This is precisely the scenario that Regal Games negotiated with SellerX to avoid when it specified SellerX's requirements in connection with the Deferred Payment.

### b. Inventory

As acknowledged in your June 13 letter, SellerX allowed certain inventories to drop to zero this past Easter holiday season.[5] Zero inventory is indisputably insufficient. At other times, SellerX raised prices on products and reduced

---

[5] It is our understanding that there are several other examples of SellerX failing to maintain sufficient inventories of Chalk City products as required by the APA.



David J. Fioccola, Esq.
Morrison & Foerster LLP
June 22, 2022
Page 8 of 14

advertising spend in a transparent attempt to avoid showing zero products in inventory. For example:

- SellerX's inventory of ASIN B08L45KLDF was depleted in April of 2021 and not restocked in Amazon until April 25, 2022.
- SellerX reduced advertising spend and raised pricing on ASIN B071CKSMS7 (the best-selling product) during the 2022 Easter season as a result of extremely low inventory.
- At Regal Games' suggestion, SellerX introduced a new 165 count chalk listing, which was ready to ship in September 2021. Inexplicably, SellerX did not start selling the item until April 29th, 2022.

In SellerX's defense, you contend that "Section 14(b) does not impose any duty on SellerX to maintain any specific inventory levels of any specific products at any specific time." We are confident that a jury with disagree with the contention that despite repeatedly having no, or extremely low, inventory of products available on Amazon, and raising prices to avoid running out of inventory, SellerX nonetheless maintained "sufficient inventories" of Chalk City products on the Amazon marketplace.

Further, the suggestion that SellerX did not have data regarding demand for the Easter season available to it is demonstrably false. Regal Games specifically advised SellerX that the Easter season is "the Super Bowl of chalk," making it abundantly clear that SellerX needed to have ample inventory. More to the point, Regal Games provided *all* of its historical sales data to SellerX — and the parties specifically timed the Trailing Period to encompass the Easter season for exactly that reason.

As to the wholesale order, you seem to be suggesting that SellerX's failure to maintain sufficient inventory levels is somehow Regal Games' fault. That is not the case. Contrary to the misstatements in your letter, Regal Games did not "unexpectedly" ask SellerX to fulfill a large wholesale order outside of Chalk City's customary sales channels. As SellerX is well-aware, that order was placed well in advance of the Easter season, and the order itself was for a relatively small amount of inventory. Specifically, Regal Games submitted the VCS order that you referenced to SellerX in January 2022, affording ample time for SellerX to plan its inventory accordingly. The reality is, SellerX dropped the ball. On March 3, 2022,

8



David J. Fioccola, Esq.
Morrison & Foerster LLP
June 22, 2022
Page 9 of 14

Ankit Vora, a senior brand manager at SellerX, emailed Regal Games, admitting, "We missed taking into account the VCS order while inbounding stock into Amazon for the spring peak period." This admissible statement against interest eviscerates your position.

Moreover, the suggestion that SellerX was unaware that Chalk City's wholesale business was one of its customary sales channels is incongruous. There is substantial evidence to show that SellerX had extensive knowledge that wholesale was, and is, a customary sales channel for Chalk City. There is extensive documentary evidence demonstrating that Regal Games offered and sold Chalk City products to other customers at the request of (and with pricing from) SellerX. In particular, Mr. Vora asked Regal Games to sell inventory to other retailers on several occasions. Even if this documentation didn't exist, it is inconceivable that SellerX — an Amazon business aggregator — would pay millions of dollars to acquire a product line without fully apprising itself of the ins-and-outs of the business, including its customary sales channels. We're confident that SellerX's investors would agree.

### c.   Expansion to New Markets

The contention that SellerX's failure to make *any sales whatsoever* as of May 9, 2022 — nine days *after* the close of the Trailing Period — in Europe, or any other new market for that matter, was not a breach of its obligation, is devoid of any merit. The APA explicitly requires SellerX to expand into new markets and the Trailing Period is clearly the applicable time frame for that expansion to have taken place. No reasonable judge or jury could come to any other conclusion. To the extent you have identified controlling legal authority that indicates otherwise, please provide citations.

You also claim that SellerX has "taken expeditious steps" in furtherance of its obligation to expand into new markets. The only support provided is that SellerX has been "managing the compliance and legal requirements necessary to obtain the required certifications for the chalk products prior to shipping the products from China to Europe." To the extent anyone can comprehend what that means, it's a vague contention that is insufficient to demonstrate that SellerX has made *all possible good faith efforts*. If what you're referring to is the common industry knowledge that the European market requires a different product label than the



David J. Fioccola, Esq.
Morrison & Foerster LLP
June 22, 2022
Page 10 of 14

American product, that could not have reasonably held up new market entry for upwards of a year. The relabeling should have taken a graphic designer familiar with the European Union symbols less than one hour. As to European Union safety testing, that's a less than a two-week process, with 24-hour rush services available. If you're referring to some other "compliance and legal requirements," please identify them with specificity.

You may not be aware, but the product that SellerX ordered for the European market was ready for shipment *in September 2021*. Inexplicably, SellerX dithered. Setting up an EU Amazon account may, charitably, be a 2–3-week process, although presumably less for SellerX as an EU-based company of purported Amazon experts. Nevertheless, we understand that SellerX only engaged a third-party to begin setting up European listings early in the summer of 2021, and then, for reasons unknown, decided to undertake this project in-house, but was unable or unwilling to complete it. Then, *on March 25, 2022*, SellerX contacted Regal Games to request assistance creating the listings — slightly more than a month before the Trailing Period was set to conclude. Finally, as you note, SellerX failed to make *any sales whatsoever* in new markets prior to the close of the Trailing Period. Suffice it to say, we have different understandings of the word "expeditious."

In addition, any attempt to rely on the "Entire Agreement" provision, Section 21(l) of the APA, to excuse SellerX's breach will be unsuccessful. SellerX simply cannot demonstrate that it made *all possible good faith efforts* to achieve income levels that would trigger the Deferred Payment, specifically in regard to its explicit obligation to expand into new markets under Section 14(b) of the APA. Regal Games need not rely on extrinsic evidence — such as the representations made by SellerX during the parties' negotiations — to demonstrate that SellerX is in breach.[6] The

---

[6] You assert, without citation, that "'plans [that] are not part of the Agreement between the parties[] cannot form the basis of any breach." However, as you are likely aware, when interpreting a best efforts clause, New York courts will consider the contract's surrounding facts and circumstances, if the meaning can be derived from external standards or circumstances with a reasonable degree of certainty. *See, e.g., Maestro W. Chelsea SPE LLC v. Pradera Realty Inc.*, 954 N.Y.S.2d 819, 824 (Sup. Ct. N.Y. Co. 2012) (citing *McDarren v. Marvel Entertainment Group, Int'l,* No. 09 Civ. 0910, 1995 WL 214482, at *4 (S.D.N.Y. April 7, 1995) and *Proteus Books Ltd. v. Cherry Lane Music Co.,* 873 F.2d 502 (2d Cir.1989)); *Errant Gene Therapeutics, LLC et al., Plaintiffs, v. Sloan-Kettering Inst. for Cancer Rsch.,* No. 15-CV-2044 (AJN), 2016 WL 205445, at *7 (S.D.N.Y. Jan. 15, 2016) ("[E]xtrinsic circumstances concerning the parties' understanding of [a] term may be considered by the finder of



David J. Fioccola, Esq.
Morrison & Foerster LLP
June 22, 2022
Page 11 of 14

plain English phrase "expanding into new markets" is unambiguous. A layperson would understand that it means selling the Chalk City products in markets that it previously had not been sold in. Frankly, confining the scope of the APA to its four corners will only serve to further demonstrate that SellerX is in default. Section 14(b) requires "expanding into new *markets*." The word "markets" is *plural*. SellerX has failed to bring Chalk City to a single new market, let alone more than one.

You claim that "it is entirely irrelevant whether any sales in Europe had been made prior to the May 9 email," setting aside the parties' actual discussions about the importance of European expansion, it is patently obvious (and will be to a jury) that Regal Games sold the Assets to SellerX — a company that self-identifies as "Europe's #1 aggregator" — for a reason. The reason is exactly what SellerX claims to do in its very own tagline; taking the Chalk City brand global, specifically including Europe where SellerX is based. Moreover, SellerX has failed to put forth a single shred of evidence that it has expanded Chalk City into any new markets, whether European or otherwise. Should this matter proceed to litigation, we would welcome the opportunity to address these meritless contentions with the court, should you wish to raise them.

### d. Advertising

Contrary to the statement in your June 13 letter, had the parties' interests been aligned, SellerX would have made all possible good faith efforts to achieve income levels that would trigger the Deferred Payment. Instead, it seems clear that SellerX made a calculated decision not to take the necessary actions specifically spelled out in the APA to deliberately avoid having to make the Deferred Payment. To wit, Regal Games spent $393,323 on direct advertising on the Amazon platform for the 12 months ending March 31, 2021. By contrast, SellerX spent $302,390 for the 12 months ending April 30st 2022, *a more than 23% reduction in advertising spend*.[7] SellerX *reduced* its advertising budget for the Assets during the Trailing

---

fact" in evaluating breach) (quoting *USAirways Grp., Inc. v. British Airways PLC*, 989 F. Supp. 482, 491 (S.D.N.Y. 1997)). While extrinsic evidence is not required to understand the explicit obligations set forth in the APA, those plans constitute competent evidence that will aid a fact finder in interpreting the balance of the efforts clause.

[7] For your reference, this comparison is of two equivalent 12-month periods ending at Easter, because both parties were aware Easter sales are the biggest part of the year.



David J. Fioccola, Esq.
Morrison & Foerster LLP
June 22, 2022
Page 12 of 14

Period as compared to prior years, making no attempt to maintain *sufficient* advertising to sustain market share. To be clear, nothing in the APA gives SellerX an out from its obligations under Section 14(b) due to foreseeable changes in the market, including the entrance of Amazon Retail as a competitor.

As to the other factually and legally inaccurate statements in your letter, Regal Games has not asserted that "Seller X was required to spend an uncapped amount of money [on advertising] to try to keep sales at any prior level." SellerX's obligation was "maintaining sufficient advertising to sustain market share." Ultimately, the cap on SellerX's financial obligations is the full Deferred Payment in the amount of $900,000. At whatever point in time during the Trailing Period SellerX decided against maintaining sufficient advertising spending to sustain market share, its obligation to make the full Deferred Payment to Regal Games became compulsory and SellerX's failure to do so plainly amounts to breach.

## II. Failure to Make Deferred Payment

As discussed above, the APA required more than best efforts; it required *all possible good faith efforts*. Ultimately, it is indisputable that not only did SellerX fail to take all possible good faith efforts to achieve income levels that would trigger the Deferred Payment, but it also failed to make the enumerated efforts that were specifically prescribed by the APA. The sole remedy for SellerX's breaches of its efforts obligations under Section 14(b) is a "complete payment of the full possible Deferred Payment," which is established in Section 4(b) of the APA as $900,000. For the reasons explained above, the entire Deferred Payment was due on May 31, 2022, and is now overdue.

SellerX's failure to make the full possible Deferred Payment of $900,000, due to its breach of Section 14(b) of the APA, is a separate and independent breach, constituting Buyer Default under Section 11(a) of the APA.

On June 3, 2022, Regal Games provided Dr. Kryzwicki with a formal notice of breach, explicitly identifying that SellerX breached the APA by failing to make the Deferred Payment and failing to take the required good faith efforts to achieve the Deferred Payment. Ms. Noora Haapaniemi acknowledged receipt of the notice



David J. Fioccola, Esq.
Morrison & Foerster LLP
June 22, 2022
Page 13 of 14

of breach on behalf of SellerX on June 5, 2022.[8] Inexplicably, SellerX failed to cure its Default within the five-day grace period prescribed in Section 11(c) of the APA, which failure continues to-date.

### III.    Independent Auditor

You state that Regal Games may not institute litigation prior to bringing its dispute before an independent auditor pursuant to Section 5 of the APA. This fundamentally misunderstands the APA. Section 5 of the APA is intended to resolve accounting questions and/or disputes. The instant matter concerns SellerX's breaches of contract. The suggestion that Regal Games' claims of breach should be heard by an auditor is as confused as the rest of SellerX's purported justifications for its breaches. To be clear, Regal Games can and will institute litigation if SellerX necessitates such action by failing to promptly cure its breach.

### IV.    Demand

Because Regal Games has the ability to terminate the APA for Default, Regal Games is empowered to, and intends to, take possession of the Assets. In light of this, demand is hereby made that SellerX not take any actions to further encumber, impair or diminish the Assets. We are confident that when this matter is adjudicated, a Court will further order the return of the Assets, as a remedy for SellerX's Default under Section 11 of the APA.

Consistent with the foregoing, demand is hereby made that SellerX immediately make payment of $900,000 to Regal Games in order to avoid litigation, as contemplated in Sections 11(b), 17 and 21(k) of the APA. As a matter of professional courtesy, Regal Games is willing to forgo its claims for prejudgment interest, attorneys' fees and costs to-date provided payment-in-full is received by Monday, June 27, 2022. Should SellerX fail to comply, Regal Games will file a lawsuit against SellerX without further notice or warning. In the event that litigation is required, not only will SellerX's outstanding amount due continue to accrue with interest, but SellerX will also be liable for all attorneys' fees and costs associated with this dispute. Ultimately, SellerX's non-compliance with its

---

[8] Although Ms. Haapaniemi acknowledged receipt on June 5th, pursuant to Section 20(b) of the APA, notice was given effective as of June 3, 2022.



David J. Fioccola, Esq.
Morrison & Foerster LLP
June 22, 2022
Page 14 of 14

contractual obligations will result in it owing — and paying — far more than Regal Games is seeking in this letter.

Despite SellerX's refusal to engage in good faith to date, we remain hopeful that litigation and any consequential costs can be avoided. Please let us know if you'd like to schedule a meeting to discuss an amicable resolution.

The foregoing is not intended to be a complete recitation of all applicable law and/or facts and shall not be deemed to constitute a waiver or relinquishment of any of Regal Games' rights or remedies, whether legal or equitable, all of which are hereby expressly reserved.

We look forward to your response.

Very truly yours,

**MESSING, P.C.**

By: _AM_

ALESSANDRA CARCATERRA MESSING

14