UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

REGAL GAMES, LLC,

                        Plaintiff,

     – against –

SELLERX EIGHT GMBH,

                        Defendant.

**OPINION & ORDER**

22-cv-7455 (ER)

RAMOS, D.J.:

     Regal Games brings this action against SellerX Eight GMBH ("SellerX"), alleging SellerX breached an agreement between the parties regarding the sale of a product line of branded sidewalk chalk. Doc. 14. Before the Court is SellerX's motion to compel arbitration and Regal Games' motion for attorneys' fees and other service expenses. Docs. 17, 20. For the reasons set forth below, the Court GRANTS SellerX's motion to compel arbitration and will stay proceedings pending the outcome of arbitration. The Court DENIES Regal Games' motion for attorneys' fees and other service expenses.

**I.   BACKGROUND**

    **A. Factual Background**

       *1. The Asset Purchase Agreement*

     Regal Games is a limited liability company with its principal place of business in Illinois. Doc. 14 ¶ 12. SellerX is a German company with its principal place of business in Berlin. *Id.* ¶ 13. On April 1, 2021, SellerX entered into an agreement (the "asset purchase agreement") to purchase substantially all of the assets in Regal Games' Chalk City product line of branded sidewalk chalk. *Id.* ¶ 2. The asset purchase agreement included, *inter alia*, Chalk City's Amazon.com marketplace product listings, inventory, and all of the associated intellectual property. Doc. 14-1 at ¶ 1. The purchase price included an "Upfront Payment" from SellerX to Regal Games for $3,950,000. *Id.* ¶ 4(a).

The purchase price also included an "Inventory Payment" of $361,626. *Id.* ¶ 4(d). The Inventory Payment was also "subject to the reconciliation provisions of the [asset purchase agreement]." *Id.* The only provision describing reconciliation is paragraph nine, which is titled "Reconciliation of Inventory Payment and Amazon Accounts." *Id.* ¶ 9. SellerX made both the Upfront Payment and Inventory Payment to Regal Games, for a total of $4,311,626. Doc. 18 ¶ 5.

The asset purchase agreement also contained provisions pursuant to which Regal Games could become entitled to two future payments, if and only if Chalk City met or exceeded certain revenue targets. First, Regal Games would be entitled to a "Deferred Payment" of $900,000 if Chalk City's net sales for the period between May 1, 2021 and April 30, 2022 (the "Trailing Period") increased, remained flat, or decreased by less than 5% compared to net sales in the 12 months immediately prior to the Trailing Period (the "Reference Period"). Doc 14-1 ¶ 4(b). If net sales decreased by 15% or more between the Reference Period and the Trailing Period, then Regal Games would not be entitled to any Deferred Payment. *Id.* Second, Regal Games would be entitled to an "Earn-Out Payment" if, and only if, the earnings before interest, taxes, depreciation, and amortization ("EBITDA") generated by Chalk City sales for the period of 12 months following the effective date of the asset purchase agreement (the "Earn-Out Period") exceeded $1,112,676. *Id.* ¶ 4(c). In that case, Regal Games would be entitled to 40% of the EBITDA over $1,112,676. *Id.*

The asset purchase agreement also included certain provisions to submit certain disputes to an independent auditor, a Certified Public Accountant ("CPA") agreed upon by both the parties (the "Independent Auditor"). *See id.* ¶¶ 5,9. Specifically, paragraph five stated:

> (5) **Deferred Payment Statement, Earn-Out Statement**. "Within fourteen (14) days following the completion of the Trailing Period, [SellerX] shall provide [Regal Games] with a statement (the "Deferred and Earn-Out Payment Statement") that sets forth the [n]et

2

> [s]ales and EBITDA for the Trailing Period together with reasonable documentation supporting the information set forth in the Deferred and Earn-Out Payment Statement . . . . If [Regal Games] has any objections to the Deferred and Earn-Out Payment Statement, then [Regal Games] shall deliver to [SellerX] a statement (a "Payment Objection Statement") setting forth its disputes or objections (the "Payment Disputes") . . . . If a Payment Objection Statement is not delivered to [SellerX] within fourteen (14) days after delivery of the of the Deferred and Earn-Out Payment Statement, then the Deferred and Earn-Out Payment Statement as originally delivered by [SellerX] shall be final, binding and non-appealable by the parties. If a Payment Objection Statement is timely delivered, then [SellerX] and [Regal Games] shall negotiate in good faith to resolve any Payment Disputes, but if they do not reach a final resolution within thirty (30) days after the delivery of the Payment Objection Statement, [Regal Games] and [SellerX] shall engage and submit each unresolved Payment Dispute to a mutually agreed upon certified public accountant (the "Independent Auditor") to resolve such Payment Disputes . . . . The Independent Auditor shall . . . make its determination in respect of such Payment Disputes within thirty (30) days following its retention . . . . The Independent Auditor's determination of such Payment Disputes shall be final and binding and nonappealable upon the parties.

*Id.* ¶ 5. Paragraph nine contained a substantially similar provision:

> (9) **Reconciliation of Inventory Payment and Amazon Accounts.**
>
> (a) The Parties understand and agree that [SellerX] owns the [a]ssets on the Effective Date. However, Parties understand and agree that revenue associated with the [a]ssets may continue to accumulate in [Regal Games'] Amazon account ("Residual Amazon Revenue").
>
> [ . . . .]
>
> (c) Within sixty (60) days following the [transfer of Chalk City assets], [Regal Games] shall prepare and deliver to [SellerX] a statement (the "Adjustment Statement") setting forth [Regal Games'] good faith calculation of (i) the Residual Amazon Revenue . . . together with reasonable documentation supporting the information set forth in the Adjustment Statement.
>
> (d) . . . . If [SellerX] has any objections to the Adjustment Statement, then [SellerX] shall deliver to [Regal Games] a statement (an "Adjustment Objection Statement") setting forth its disputes or objections (the "Adjustment Disputes") to the Adjustment Statement . . . . If an Adjustment Objection Statement is not delivered to [Regal Games] within fourteen (14) days after delivery of the Adjustment Statement, then the Adjustment Statement as originally delivered by

3

> [Regal Games] shall be final, binding and non-appealable by the parties. If an Adjustment Objection Statement is timely delivered, then [SellerX] and [Regal Games] shall negotiate in good faith to resolve any Adjustment Disputes, but if they do not reach a final resolution within thirty (30) days after the delivery of the Adjustment Objection Statement, [Regal Games] and [SellerX] shall engage and submit each unresolved Adjustment Dispute to the Independent Auditor to resolve such Adjustment Disputes . . . . The Independent Auditor shall . . . make its determination in respect of such Payment Disputes within thirty (30) days following its retention . . . . The Independent Auditor's determination of such Adjustment Disputes shall be final and binding and non-appealable upon the parties.

*Id.* ¶ 9. Finally, paragraph 21(k) of the asset purchase agreement provided that "any and all claims arising out of or related to the asset purchase agreement, including its validity, interpretation, breach, violation, or termination, shall be brought in the exclusive forum of the state or federal courts located in New York County, New York and pursuant to New York law." *Id.* ¶ 21(k). The asset purchase agreement does not include an express "arbitration" provision.

   2.  *Chalk City's Revenue Declines*

Unforeseen market competition from Amazon and loosening COVID-19 restrictions severely impacted Chalk City's net sales and EBITDA. Doc 18 ¶¶ 7–10. As a result, Chalk City recognized losses each month from July 2021 to January 2022. *Id.* at 11. Thus, according to SellerX, Chalk City's net sales and EBITDA for the Trailing Period and Earn-Out Period did not exceed the thresholds at which Regal Games would become entitled to any portion of the Deferred or Earn-Out Payments. *Id.* ¶ 12.

On May 13, 2022, SellerX reported Chalk City's earnings to Regal Games in the Deferred and Earn-Out Statements, which included information about Chalk City's net sales and EBITDA. Doc. 14–2. On May 26, 2022, Regal Games submitted its Payment Objection Statement to SellerX, and requested additional documentation to evaluate SellerX's figures. Doc. 14 ¶ 42. That same day, SellerX sent Regal Games a spreadsheet

providing additional information. Doc. 14 at ¶ 43. On June 13, 2022, counsel for SellerX also provided additional documentation. *Id*. ¶ 44. That same date, Regal Games provided SellerX notice of its alleged breach of its obligations to make the Deferred Payment. *Id.* ¶ 48. On June 22, 2022, counsel for Regal Games' provided a letter to SellerX purporting to "debunk[] the various claims and excuses asserted in the June 13 letter." *Id.* ¶ 47.

3. *Procedural Background*

Regal Games originally filed this action on August 31, 2022, Doc. 1, and submitted a corrected complaint[1] on October 24, 2022. Doc. 4. An electronic summons was issued on November 22, 2022. Doc. 6. The first amended complaint was filed on March 8, 2023 and is the operative complaint for this action. Doc. 14. Regal Games brought claims for breach of contract, and breach of the covenant of good faith and fair dealing. *Id*. ¶¶ 80–100. Regal Games also sought a declaratory judgment that SellerX had defaulted[2] on the asset purchase agreement such that Chalk City should be returned to Regal Games, and requested specific performance to that effect. *Id*. ¶¶ 53–79; 101–115.

Regal Games served SellerX in Germany, pursuant to the Convention on the Service Abroad of Judicial and Extrajudicial Documents (the "Hague Convention") on January 24, 2023. Doc. 18 ¶ 21. SellerX moved to compel arbitration on March 29, 2023. Doc. 17. In its brief, SellerX requests that the Court stay this action in favor of arbitration, or in the alternative, dismiss Regal Games' claims for the breach of implied covenant of good faith and fair dealing as well as its demand for Chalk City to be

---

[1] The original complaint was flagged as a deficient pleading by the Clerk of Court because it was filed against the wrong party.

[2] According to Regal Games, SellerX's failure to "cure its breach within the five-day cure period specified by Section 11(c) of the [asset purchase agreement] . . . constituted a Buyer's Default pursuant to Section 11(a) of the [asset purchase agreement]" and provides Regal Games the right to terminate the Agreement and re-possession of the Chalk City assets. *Id.* at ¶ 49, 50. SellerX disputes that it is in default. Doc. 23 at 15. This matter is not at issue on the motions before the Court.

returned. Doc. 19 at 9. SellerX also argues that it is entitled to the Residual Amazon Revenue in Regal Games' account, which "by [Regal Games'] own calculation, amounts to $335,532." *Id*. at 6. Separately, Regal Games moved for attorneys' fees and other service expenses on March 29, 2023. Doc. 20.

### 3. *Disputes over Service*

Prior to filing the lawsuit, Regal Games alleges it made repeated requests to SellerX's former outside counsel regarding service. Doc. 20 at 6. SellerX's former outside counsel indicated that SellerX had not authorized him to accept or to waive service of any action that Regal Games might file. *Id*. at 6–7. On August 31, 2022, Regal Games sent, *inter alia*, notice of this action, a request to waive service of summons, and a waiver of service to SellerX's co-founders, in-house counsel, and prior outside counsel via email. *Id*. at 7. Those documents were also sent to SellerX's German headquarters via FedEx and were delivered on September 2, 2022. *Id*. On October 27, 2022, SellerX responded to the waiver request, informing Regal Games' counsel that SellerX did not consent to the waiver and demanding service pursuant to the Hague Convention. *Id*.

As a result, Regal Games alleges it was required to expend a total of $4,591.32 in third-party costs, excluding the associated attorneys' fees, to effect service. *Id*. at 9.

## II.   LEGAL STANDARD

### 1. *Motion to Compel Arbitration*

Under the Federal Arbitration Act ("FAA"), "[a] written provision in . . . a contract . . . to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable." 9 U.S.C. § 2. The FAA reflects "a liberal federal policy favoring arbitration agreements," *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 346 (2011) (quoting *Moses H. Cone Memorial Hospital. v. Mercury Construction Corp.*, 460 U.S. 1, 24 (1983)), and places arbitration agreements on "the same footing as other contracts," *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 118 (2d Cir. 2012) (quoting *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 511 (1974)). But

parties are not required to arbitrate unless they have agreed to do so. *Id.* (citation omitted). Thus, before an agreement to arbitrate can be enforced, the district court must first determine whether such an agreement exists between the parties. *Id.* This question is determined by state contract law principles. *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016).

In the context of motions to compel arbitration, allegations related to the question of whether the parties formed a valid arbitration agreement are evaluated to determine whether they raise a genuine issue of material fact. *Schnabel*, 697 F.3d at 113; *see also Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003) ("In the context of motions to compel arbitration brought under the [FAA], the court applies a standard similar to that applicable for a motion for summary judgment. If there is an issue of fact as to the making of the agreement for arbitration, then a trial is necessary."). On a motion for summary judgment, the court considers "all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . affidavits," and draws "all reasonable inferences in favor of the non-moving party. " *Meyer v. Uber Technologies., Inc.*, 868 F.3d 66, 74 (2d Cir. 2017) (internal quotation marks and citations omitted).

The party seeking to compel arbitration bears an initial burden of demonstrating that an agreement to arbitrate was made. *See Zachman v. Hudson Valley Fed. Credit Union*, 49 F.4th 95, 101 (2d Cir. 2022) (citation omitted). This burden does not require the moving party to show that the agreement would be enforceable—only that an agreement to arbitrate existed. *See Harrington v. Atlantic Sounding Co.*, 602 F.3d 113, 124 (2d Cir. 2010). Once the existence of an agreement to arbitrate is established, the burden shifts to the party seeking to avoid arbitration to "show[] the agreement to be inapplicable or invalid." *Id.* (citation omitted); *see also Doctor's Assocs., Inc. v. Alemayehu,* 934 F.3d 245, 251 (2d Cir. 2019) ("An agreement that has not been properly formed is not merely an unenforceable contract; it is not a contract at all.").

If the Court determines that a valid arbitration agreement exists, the Court must then determine whether the particular dispute falls within the scope of the agreement. *Specht v. Netscape Communications Corp.*, 306 F.3d 17, 26 (2d Cir. 2002) (citation omitted)). If the dispute falls within the scope of the arbitration agreement, the "role of the court ends and the matter is one for arbitration." *Unique Woodworking, Inc. v. N.Y.C. Dist. Council of Carpenters' Pension Fund*, No. 07-cv-1951 (WCC), 2007 WL 4267632, at *4 (S.D.N.Y. Nov. 30, 2007).

### 2. Attorney's Fees

Federal Rule of Civil Procedure 4(d) provides in pertinent part as follows:

> (1) *Requesting a Waiver*. An individual, corporation, or association that is subject to service under Rule 4(e), (f), or (h) has a duty to avoid unnecessary expenses of serving the summons . . . .
>
> [. . . ]
>
> (2) *Failure to Waive*. If a defendant located within the United States fails, without good cause, to sign and return a waiver requested by a plaintiff located within the United States, the court must impose on the defendant: (A) the expenses later incurred in making service; and (B) the reasonable expenses, including attorney's fees, of any motion required to collect those service expenses.

Fed. R. Civ. P. 4(d)(1), (d)(2). The Advisory Committee Note states, in pertinent part:

> - A defendant failing to comply with a request for waiver shall be given an opportunity to show good cause for the failure, but sufficient cause should be rare. . . . Sufficient cause not to shift the cost of service would exist, however, if the defendant did not receive the request or was insufficiently literate in English to understand it. It should be noted that the provisions for shifting the cost of service apply only if the plaintiff and the defendant are both located in the United States, and accordingly a foreign defendant need not show "good cause" for its failure to waive service.

Fed. R. Civ. P. 4 Advisory Note to 1993 Amendment.

## III. DISCUSSION

### 1. SellerX's Motion to Compel Arbitration is Granted

SellerX argues that the Court should compel arbitration. To determine whether to compel arbitration, the Court must weigh four primary considerations: (1) Whether the

8

parties in fact agreed to arbitrate; (2) the scope of the arbitration agreement; (3) if the parties assert federal statutory claims, whether Congress intended those claims to be nonarbitrable; and (4) if the court concludes that some, but not all, of the claims in the case are arbitrable, whether to stay the balance of the proceedings pending arbitration. *Application of Whitehaven S.F., LLC v. Spangler*, 45 F. Supp. 3d 333, 342 (S.D.N.Y. 2014), *aff'd,* 633 F. App'x. 544 (2d Cir. 2015).  Since federal statutory claims are not at issue here, the Court examines the remaining three factors in turn.

    a. *The Parties Agreed to Arbitrate Disputes over the Calculation of Net Sales, EBITDA, and Residual Amazon Revenue*

The parties dispute whether an arbitration agreement exists.  SellerX argues that, based on the plain language of paragraphs five and nine, the asset purchase agreement instructs the parties to arbitrate any disputes over (1) the calculation of Chalk City's net sales and EBITDA, and (2) Regal Games' calculation of its Residual Amazon Revenue. Doc. 19 at 16.  Regal Games contends that the asset purchase agreement does not expressly include the word "arbitrate" and only requires the parties to use an Independent Auditor for specific accounting disputes and not legal disagreements.  Doc. 22 at 10.

The "crucial inquiry" under the first factor of the test is "whether the parties have agreed to submit a dispute that has arisen between them for final and binding determination by a third-party." *Seed Holdings, Inc. v. Jiffy Int'l AS*, 5 F. Supp. 3d 565, 576-77 (S.D.N.Y. 2014).  Here, Paragraph five of the asset purchase agreement sets out a specific procedure for SellerX to report its net sales and EBITDA during the Trailing Period and Earn-Out Period to Regal Games.  If the parties were unable to resolve disputes regarding these calculations within 30 days, they agreed to "submit each unresolved Payment Dispute to [the Independent Auditor]" to "resolve" such disputes, and further stipulated that the Independent Auditor's determination would be "final and binding and nonappealable."  Doc. 14–1 ¶ 5.  Likewise, paragraph nine of the asset purchase agreement states that Regal Games would prepare an "Adjustment Statement"

setting forth its calculation of any Residual Amazon Revenue, which it would deliver to SellerX. *Id*. ¶ 9(c). As with paragraph five, if the parties were unable to solve disputes about the Adjustment Statement within 30 days, the parties would "submit each unresolved Adjustment Dispute to the Independent Auditor to resolve," and stipulated that the Independent Auditor's determination would be "final and binding and nonappealable." *Id.* ¶ 9(d).

While Regal Games is correct that the asset purchase agreement does not employ the words "arbitration" or "arbitrator," the Second Circuit has held that it is "irrelevant that the contract language in question does not employ the word 'arbitration' as such." *McDonnell Douglas*, 858 F.2d 825 (2d Cir. 1988). Instead, "what is important is that the parties clearly intended to submit some disputes to their chosen instrument for the definitive settlement of certain grievances." *Id*. (quotation marks and internal citation omitted). Indeed, Courts in this district have consistently held no magic words are required to create an agreement to arbitrate. *See, e.g.*, *Seed*, 5 F. Supp. 3d at 570, 577-78 ("Given that Section 2.8 prescribes a final and binding dispute resolution by the [accounting firm], it is irrelevant that the process is not termed an 'arbitration.'"); *Vanguard Logistics (USA), Inc. v. Blujay Solutions Ltd.*, 20-cv-4383(ALC), 2021 WL 1165068, at *3 (S.D.N.Y. Mar. 25, 2021) ("Courts have generally concluded that [n]o magic words such as 'arbitrate' . . . are needed to obtain the benefits of the [FAA].") (quotation marks and internal citation omitted). Here, the asset purchase agreement expressly states, and therefore clearly intends, for the Independent Arbitrator's resolution of Payment and Adjustment Disputes to be "binding, and nonappealable." Doc. 14–1 ¶¶ 5, 9. Accordingly, the lack of the express word "arbitration" is not fatal to SellerX's argument.[3]

---

[3] Regal Games also offers a declaration from Michael Roberts, the sole member of Regal Games, stating that the company never intended to enter an arbitration agreement. *See* Doc. 22-1 ¶ 41. State contract law principles govern the existence of whether an arbitration agreement exists. *Nicosia*, 834 F.3d at 229. In

Regal Games points out that the Independent Auditor is a CPA whose authority does not encompass legal issues and is instead "confined to a discrete set of accounting issues, to address disagreements among the parties about their respective calculations of net sales, EBITDA, and [Residual Amazon Revenue]." Doc. 22 at 10. This argument is of no moment. By its own admission, SellerX only seeks to have the Payment and Adjustment Disputes decided in arbitration before the lawsuit goes forward. Doc. 23 at 11. To the extent Regal Games argues that a CPA cannot serve as an arbitrator, courts in this Circuit routinely enforce arbitration agreements where the arbitrators are non-legal experts. *See, e.g.*, *Bakoss v. Certain Underwriters at Lloyds of London Issuing Certificate No. 0510135*, 707 F.3d 140, 142–44 (2d Cir. 2013) (finding arbitration agreement where parties agreed to have third-party physician make a determination about the plaintiff's disability); *McDonnell Douglas*, 858 F.2d 825 (2d Cir. 1988) (finding arbitration agreement where parties agree to submit certain disputes to an independent tax counsel); *Seed*, 5 F. Supp. 3d at 570, 577-78 (finding arbitration agreement where parties agreed to submit certain disputes to a third-party accounting firm).

Next, Regal Games relies on a Delaware Chancery court case that distinguished between an expert determination and an arbitration. *Ray Beyond Corp. v. Trimaran Fund Mgmt., LLC.*, No. 18-cv-0497, 2019 WL 366614 (Del. Ch. Jan. 29, 2019). As a preliminary matter, a Delaware case is not precedential. But even on the merits, the Court finds that the case is inapposite. In *Ray Beyond*, the court found that the parties' escrow dispute did not fit within an independent accountant's authority because the issue of "who is entitled to the escrow funds . . . . raises primarily legal question[s] of whether a certain legal contract meets the definition of a qualifying contract." *Id*. at *1.

---

New York, language outside the four corners of a contract will generally not vary the writing. *See, e.g.*, *W.W.W. Associates, Inc. v. Giancontieri*, 77 N.Y.2d 157, 162 (1990). Accordingly, the Roberts' Declaration does not trump or alter the language of the asset purchase agreement.

Additionally, the agreement between the parties included an "expert not arbitrator stipulation."[4] *Id*. at *8. Here, the calculations of net sales, EIBTDA, and Residual Amazon Revenue are plainly within the scope of the Independent Auditor's expertise as an accountant, and there is no analogous "expert not arbitrator" stipulation in the asset purchase agreement. Accordingly, the Court finds that *Ray Beyond* does not compel a different result.

Finally, Regal Games uses the asset purchase agreement's choice-of-law provision in paragraph 22(k) as evidence the parties did not intend to arbitrate the disputed calculations. Doc. 22 at 11. However, courts are required to "adopt an interpretation that gives meaning to every provision of a contract." *Paneccasio v. Unisource Worldwide, Inc.,* 532 F.3d 101, 111 (2d Cir. 2008). Also, "specific language in a contract will prevail over general language where there is an inconsistency between two provisions." *Id.* Regal Games' construction of the contract would strip paragraphs five and nine of meaning, because the arbitration agreements would be irrelevant. Even assuming there is inconsistency between paragraphs five and nine, on the one hand, and the choice-of-law provision in paragraph 22(k) on the other, the specific language regarding disputed calculations of net sales, EIBTDA, and Residual Amazon Revenue prevail over the more general choice-of-law provision. The Court thus finds that the choice-of-law provision does not support Regal Games' argument.

In sum, the Court finds the asset purchase agreement includes an agreement to arbitrate disputes about the calculations of net sales and EIBTDA in paragraph five, as well as an agreement to arbitrate disputes about the Residual Amazon Revenue in paragraph nine ("the arbitration agreements").

---

[4] Specifically, the agreement in *Ray Beyond* expressly stated that "certain disputes . . . would be resolved by a third-party independent accounting firm . . . which would be an expert not an arbitrator." *Ray Beyond Corp*, 2019 WL 366614 at *3.

> b. *The Scope of the Arbitration Agreements Include Calculation of Net Sales, EBITDA, and Residual Amazon Revenue*

Under the second factor, the Court must examine the scope of the arbitration agreements. SellerX argues there is no ambiguity that paragraphs five and nine encompass disputes over the calculation of net sales, EBITDA, and Residual Amazon Revenue. Doc. 19 at 27. In response, Regal Games argues that the procedure specified in the arbitration agreements was not followed and that SellerX was unfairly dilatory in seeking review of the disputed calculations. Doc. 22 at 14–15.

Given the strong federal policy in favor of arbitration such that any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, courts "will compel arbitration unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Collins & Aikman Prod. Co. v. Bldg. Sys., Inc.*, 58 F.3d 16, 19 (2d Cir. 1995) (internal quotations and citations omitted). Paragraphs five and nine expressly encompass disputes over the calculation of net sales and EBITDA. Indeed, the express purpose of paragraphs five and nine is to provide a procedure for resolving such disputes. *See* Doc. 14–1 ¶¶ 5, 9. Thus, the arbitration agreements clearly cover the disputed calculations.

The parties' dispute over the calculation of the Residual Amazon Revenue warrants further analysis. Regal Games argues that because SellerX did not deliver timely objections to the adjustment statement, it is estopped from disputing the calculation of the Residual Amazon Revenue. Doc. 22 at 12–13. SellerX responds with a slightly different point, arguing that even assuming objections to the calculation are estopped, Regal Games' refusal to turn those funds over to SellerX constitutes a ripe Adjustment Dispute that is subject to arbitration. Doc. 23 at 4–5.

Here, paragraph four of the asset purchase agreement stated that SellerX's inventory payment for Chalk City "is subject to the reconciliation provisions of this [a]greement below." Doc. 14–1 ¶ 4(d). The only provision describing reconciliation is

13

paragraph nine, which is titled "Reconciliation of Inventory Payment and Amazon Accounts." *Id*. ¶ 9.  And as explained in more detail above, paragraph nine creates an arbitration agreement for any Adjustment Dispute regarding the Residual Amazon Revenue.  Thus, paragraph nine can be fairly read to encompass SellerX's entitlement to receive the Residual Amazon Revenue.  *See Collins*, 58 F.3d at 19.  This result is supported by another section of paragraph nine, which notes that the parties "understand and agree that [SellerX] owns the [a]ssets" but that "revenue associated with the [a]ssets may continue to accumulate in [Regal Games'] Amazon account."  Doc. 14–1 ¶ 9(a).  As a practical matter, the Court notes that if SellerX owned the Chalk City assets, SellerX would also own (and thus would be entitled to) any revenue that Chalk City accrued, even if such revenue collected in another account.  Accordingly, the Court finds that the arbitration agreement in paragraph nine can be read to include a dispute over the transfer of the Residual Amazon Revenue to SellerX.

      Regal Games then asserts that SellerX did not provide it with required documents to evaluate net sales and EBITDA calculations, Doc. 22 at 14, and finally objects that "SellerX [was] aware of Regal [Game's] position [regarding net sales and EBITDA] for almost a year" and is only now seeking review by the Independent Auditor.[5]  Doc. 22 at 15.  However, these arguments have no bearing on the scope of what the arbitration agreements cover.  Because the calculation of net sales, EBITDA, and Residual Amazon Revenue falls within the scope of the arbitration agreements "the role of the court ends and the matter is one for arbitration."  *Unique Woodworking, Inc.* 2007 WL 4267632, at *4.  While Regal Games may raise these arguments before the Independent Auditor, it is not the Court's role to adjudicate these issues.

---

[5] Regal Games also makes several arguments regarding the scope of the Independent Auditor's authority. These arguments are not germane to the scope of the arbitration agreements, but instead go to the validity of the agreements.  Accordingly, these arguments are addressed in more detail under the first factor.

14

Accordingly, the Court finds that the calculation of net sales, EBITDA, and Residual Amazon Revenue falls within the scope of the arbitration agreements.

### c. Some of the Claims are Arbitrable

Because Regal Games does not assert any federal statutory claims, the Court turns to the fourth factor, or whether this action should be stayed if some, but not all of the claims in the case are arbitrable. SellerX acknowledges that the first amended complaint "raises issues that are outside of the scope of the arbitration agreement[s]"[6] but argues that it is entitled to have threshold disputes over the calculation of net sales, EBITDA and Residual Amazon Revenue conclusively resolved in arbitration before this litigation proceeds. Doc. 19 at 19–20. Regal Games responds that there is no reason to stay the entire litigation because the disputed accounting issues are extremely narrow, the stay would be limited to a maximum of thirty days[7] while arbitration is completed, and the legal proceedings and arbitration could take place simultaneously. Doc. 22 at 16.

The Court finds that a stay pending the completion of arbitration is warranted. The calculation of Chalk City's net sales, EBITDA, and Residual Amazon Revenue are the central issues in this case, and would benefit from a final determination before the litigation proceeds. First, Regal Games' theory of liability is primarily based on the allegation that SellerX intentionally depressed net sales and EBITDA to prevent triggering the Deferred Payment or Earn-Out Payment payments to Regal Games. Second, the parties dispute if the Residual Amazon Revenue must be turned over, and if so, when these funds must be transferred. *See* Doc. 22 at 8–9; Doc. 23 at 8–10. Accordingly, the Court finds that these proceedings should be stayed pending the

---

[6] While SellerX does not list these issues, the Court notes that Regal Games' brings claims for the breach of the covenant of good faith and fair dealing for SellerX's alleged failure to promote Chalk City appropriately, as well as for declaratory judgment that SellerX defaulted on the assert purchase agreement and for specific performance to cure this default by returning Chalk City to Regal Games. Doc. 14 ¶¶ 53–79; 90–115.

[7] Paragraphs five and nine of the asset purchase agreement explain that the Independent Auditor will make its determination within thirty days. Doc. 14-1 ¶¶ 5, 9.

competition of arbitration.  Even if the disputed issues are narrow, arbitration would only take thirty days to complete, and simultaneously proceedings would be possible, resolving the disputed issues before the lawsuit is sufficiently justified.

In sum, the Court grants SellerX's motion to compel arbitration and will stay these proceedings until the competition of arbitration.  Accordingly, the Court does not reach SellerX's arguments, in the alternative, as to (1) dismissal of Regal Games' claims for the breach of implied covenant of good faith and fair dealing and (2) dismissal of Regal Games' demand for Chalk City to be returned to its possession.

2. *Regal Games' Motion for Attorneys' Fees and Other Service Expenses is Denied*

Regal Games moves the Court for an award of attorneys' fees and other expenses it incurred as a result of serving the summons and complaint on SellerX, a German Company, pursuant to the Hague Convention.  Doc. 20.  Regal Games argues it is entitled to attorneys' fees and other expenses pursuant to Federal Rule of Civil Procedure 4(d)(1) and this Court's inherent authority to control its docket.  *Id*. at 10.  SellerX retorts that the text of Federal Rule of Civil Procedure ("FRCP") 4(d)(1) and legal precedent foreclose Regal Games' interpretation.  Doc. 21 at 6–12.

Regal Games asserts that the Federal Rules of Civil Procedures do not prevent a party from seeking to shift attorneys' fees and other service expenses onto a foreign party who refuses to waive service without good cause.  *Id*. at 19.  Specifically, Regal Games argues that FRCP 4(d)(1) "creates a waiver obligation on all defendants."  Doc. 20 at 14.  While FRCP 4(d)(2) "commands fee shifting where a U.S. defendant refuses to waive," it does not "proscribe fee shifting where a non-U.S. defendant refuses to waive."  *Id.*  Here, according to Regal Games, SellerX had a duty to avoid "unnecessary expenses of serving the summons."  *Id*.  SellerX allegedly violated that duty by "forcing Regal [Games] to bear the unnecessary costs of service under the Hague Convention," including the costs of obtaining certified German translations of service documents.  *Id*. at 7.  Regal Games

states there was no good cause for this refusal to waive service, as SellerX is fluent in English.[8] Regal Games also points out that SellerX did not authorize its former outside counsel to accept or waive service, *id.*, and waited from August 31, 2022 until October 27, 2022 to respond to Regal Games' formal waiver request. *Id.*

The Court is not persuaded by Regal Games' position. Regal Games does not identify a single case where a court in this Circuit or any another allowed parties to shift attorneys' fees and other service expenses onto a foreign party who was served pursuant to the Hauge Convention. Moreover, the authority in this Circuit and in others is contrary to Regal Games' argument. *Steinberg v. Quintet Publishing Limited* is instructive. In *Steinberg*, the court denied a motion for the costs of serving an English corporate defendant in the United Kingdom pursuant to the Hague Convention. *Steinberg v. Quintet Pub. Ltd.*, No. 98-cv-3348 (DLC), 1999 WL 459809, at *2 (S.D.N.Y. June 29, 1999). In reaching this result, the court explained:

> It is undisputed, however, that Quintet is an English company. Rule 4 contemplates costs for effecting service only against "a defendant located within the United States." Rule 4(d)(2), Fed.R.Civ.P.; Fed.R.Civ.P. 4 advisory committee's notes (there are no "adverse consequences to a foreign defendant" for failing to waive formal service because costs "apply only if the plaintiff and defendant are both located in the United States"). Consequently, Steinberg cannot recover costs for Quintet's failure to waive formal service.

*Id.* The results in other Circuits comport with *Steinburg*. *See, e.g.*, *BDL Int'l v. Sodetal USA, Inc.*, 377 F. Supp. 2d 518 n.5 (D.S.C. 2005) (noting that "foreign defendants can fail to comply with a request to waive service and still avoid paying for service."); *Campinha-Bacote v. Kristi Hudson and Dynamic Nursing Education*, 14-cv-320, 2015 WL 11120336 at *5 (S.D. Ohio Feb. 18, 2015) (denying fee-shifting motion because the defendant was located in Canada); *Estate of Miller by and through Miller v.*

---

[8] As evidence, Regal Games points out that the parties negotiated the asset purchase agreement in English, SellerX does significant business in the United States, and SellerX consented to the jurisdiction of New York state courts in the asset purchase agreement. Doc. 20 at 13.

*Toyota Motor Corp.*, 07-cv-1358, 2008 WL 11336631, at *1 (M.D. Fla. May 8, 2008) (denying fee-shifting motion against a Japanese defendant and stating "the plain language of the Rule compels denial of the motion.").

Like in *Steinburg*, SellerX is a foreign defendant, and Regal Games seeks to recover costs incurred while effecting service under the Hague Convention. Following *Steinburg*'s example, as well as the persuasive authority from other Circuits, the Court finds that Regal Games is not entitled to an award of attorneys' fees and other service expenses incurred as a result of serving the summons and complaint on SellerX in Germany.

### IV.   CONCLUSION

For the reasons set forth above, SellerX's motion to compel arbitration is GRANTED. The Clerk of Court is respectfully directed to terminate the motion, Doc. 17 and stay the case. Parties are directed to submit a status update within 48 hours of the arbitration decision. Regal Games' motion for attorneys' fees and other service expenses is also DENIED. The Clerk of Court is respectfully directed to terminate the motion, Doc. 20.

It is SO ORDERED.

Dated:   January 25, 2024
         New York, New York

_____
EDGARDO RAMOS, U.S.D.J.